# &#35;53 22 77

**ORIGINAL**

35

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS *ex rel.* Kim Marlowe Porter, James Murray, and Lissette Guy, | ) ) ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 *et seq.*] and TEXAS MEDICAID FRAUD PREVENTION ACT [Tex. Human Res. Code, Ch. 36, §36.101 *et seq.*]. |
| Relator-Plaintiffs, | ) ) | |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| VPA, P.C., Titan Holdings I LLC, Titan Holdings II LLC, Titan Air, LLC, Challenger Plaza LLC, VPA Woundcare P.C., Visiting Physicians Association,   VPA Diagnostics, Seniors First Medical Center, A Visiting Physician, Valley Medical Services LLC,  Flight 180 LLC, Mitchell Group Holdings LLC, U.S. Medical Management Acquisition LLC, U.S. Medical Management Inc.,  Senior Care of America, LLC, Kurt Mitchell, Mark Mitchell, Robert J. Sowislo, Jeffery S. Silverman Esq., Erlinda B. Del Pilar M.D., and Florello S. Itchon M.D., Family Nurse Care, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE  : Edmunds, Nancy G. DECK   : S. Division Civil Deck DATE   : 10/05/2005 @ 15:40:24 CASE NUMBER : 2:05CV73823 POSSIBLE SEALED MATTER, TAM **FILED IN CAMERA & UNDER SEAL** MAGISTRATE JUDGE KOMIVES |
| Defendants. | ) ) | |

## COMPLAINT

Relator-Plaintiffs Kim Marlowe Porter, James Murray and Lissette Guy

("Relators"), by and through their undersigned attorneys, on behalf of the United States

of America and the State of Texas, allege as follows in support of this Complaint against

defendants, VPA, P.C.; Titan Holdings I LLC; Titan Holdings II LLC; Titan Air, LLC;

Challenger Plaza LLC; VPA Woundcare, P.C; Visiting Physicians Association; VPA,

P.C; Seniors First Medical Center; A Visiting Physician; Family Nurse Care, Inc.; Family

Nurse Care LLC; Valley Medical Services, LLC; Flight 180, LLC; Mitchell Group

Holdings, LLC; U.S. Medical Management Acquisition LLC; U.S. Medical Management,

Inc; Senior Care of America, LLC;  Kurt Mitchell, Mark Mitchell, Robert J. Sowislo,

Jeffrey S. Silverman Esq., Erlinda B. Del Pilar M.D., and Florello S. Itchon M.D.

## I.   **INTRODUCTION**

1.     This is an action by the United States of America and the State of Texas,

by and through Relator-Plaintiffs to recover treble damages and civil penalties arising

from false statements and false claims made or caused to be made as well as conspiracy

to make false claims, by the individual defendants as well as the defendant corporations,

limited liability companies, and companies they control, to the United States Government

in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-3732, and the Texas

Medicaid Fraud Prevention Act, Tex. Human Res. Code, Ch. 36, §36.101 *et seq.*], as detailed

herein.

2.     Each of the Relator-Plaintiffs, Lissette Guy, James Murray and Kim M.

Porter, has personal knowledge, based on personal observations, of the schemes utilized

by Defendants as set out in detail hereinafter, to make or cause to be made false

statements and records in violation of § 3729(a)(2) and to submit or cause to be submitted

false claims in violation of § 3729(a)(1), in addition to the similar provisions of the Texas

Medicaid Fraud Prevention Act.

3.     Defendant VPA, P.C. is the largest entity in America providing physician

house calls.  Medicare and Medicaid regulations allow payment for physician house calls

only when certain clearly defined prerequisites ("homebound") are met.  The Defendants

herein have conspired to provide unnecessary physician house calls (once a month) to

individuals regardless of whether they meet Medicare's guidelines ("homebound") for house calls certifying as "homebound" and billing Medicare and Medicaid for individuals they are well aware do not qualify as "homebound."

4.      Defendants have also conspired to violate the rules against self-referrals by employing physicians on fixed salaries (who have no ownership interest whatsoever in VPA, Inc. or the related defendants) and directing those physician employees to order all Designated Health Services, i.e., testing, durable medical goods and health related services ("DHS") from the Defendant entities owned/controlled/associated with the individual defendants.  As a result of this scheme to violate the self-referral regulations, the employee physicians are required in order to continue their employment with VPA, P.C., to order unnecessary tests and services on a daily basis.

5.      The sole purpose of the prohibition against self-referrals was to remove any incentive for a physician to over prescribe or over utilize goods or services for which Medicare would be billed. The applicable regulations prohibiting self-referrals, when read in light of the Defendants' scheme to defraud Medicare and Medicaid, clearly prohibit the conduct of the defendants, set out in detail hereinafter, which includes: billing Medicare for "homebound" physician visits and services to individuals who leave their homes with regularity, compelling employees to order unnecessary tests based solely on the eligibility of such tests for Medicare and Medicaid reimbursement, and causing all tests, services, and goods to VPA, P.C.'s clients to be provided/performed by persons/companies controlled by Defendants.

II.  **JURISDICTION AND VENUE**

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732.  Moreover, the statutory bar in 31 U.S.C §3730(e) does not apply to the facts and circumstances of this action.

7.      This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States.  Moreover, one or more of the defendants can be found in, reside, or transact or have transacted business in the Eastern District of Michigan.

8.      Venue is proper in the Eastern District of Michigan pursuant to 31 U.S.C. § 3732(a) because one or more of the defendants maintain their corporate headquarters here, can be found in and transact or have transacted business in this district.  In addition, statutory violations, as alleged herein, occurred in this district.

III.  **Parties**

9.      Relator-Plaintiff James Murray II was hired by VPA, P.C., in January 2004, as a medical technician in their Southfield, MI office. As a medical technician, Relator Murray's duties include driving physicians to client appointments, taking and recording vital signs, performing venipuncture and tests such as EKG's, B-12 injections, vaccinations, and maintaining all patient related documents and paperwork for the physicians. Each physician has a different roster of VPA patients and Relator Murray has personally visited the homes of at least 300 VPA patients.

10.    Relator-Plaintiff Lissette Guy was employed by defendant VPA, P.C., in their West Allis, Wisconsin office from June 2, 2003 to September 3, 2003 as a medical technician.   Relator Guy was promoted to the position of patient coordinator on September 2003.   Relator Guy resigned from VPA, Inc. in June 2005.   Relator Guy, as a medical assistant, employed by VPA, P.C., traveled every day with the physician she was assigned to assist over the course of her employment with VPA, P.C.   As a medical technician, Relator Guy's duties were to drive the car from client appointment to client appointment, take and record vital signs, and perform blood draws (venipuncture) B-12 injections, vaccinations, tests such as EKG's, and maintaining all patient related documents and paperwork for the physicians.   Each VPA physician has a different roster of VPA, P.C., clients and Relator Guy has personally visited the homes of approximately 200-250 VPA patients.

11.    Relator-Plaintiff Kim Marlowe Porter was employed by defendant VPA, P.C., in their West Allis, Wisconsin office from April 26, 2004 to May 31, 2005 as a medical technician.   Her duties included driving the physician to each client appointment, taking and recording vital signs, performing venipuncture, B-12 injections, vaccinations, tests such as EKGs, and maintaining all patient related documents and paperwork for the physicians.   Relator Porter was assigned as a medical technician to 3 physicians while employed by VPA, P.C.   Each physician has a different roster of VPA patients and Relator Porter has personally visited the homes of at least 350-400 VPA patients.

12.    Defendant Jeffrey S. Silverman Esq., is a licensed attorney who acts as the registered agent for all the defendant entities set forth herein.

5

13.     Defendant Titan Holdings I LLC, is a Michigan limited liability company located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

14.     Defendant Titan Holdings II LLC, is a Michigan Limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

15.     Defendant Titan Air, LLC, is a Michigan limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

16.     Defendant Challenger Plaza LLC, is a Michigan Limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

17.     Defendant VPA Woundcare, P.C., is a Michigan corporation also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

18.     Defendant VPA, is a Michigan corporation with a registered address of 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

19.     Defendant Visiting Physicians Association, is a Michigan corporation with a registered address of 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

20.     Defendant VPA, P.C., is a Michigan corporation which uses a registered address of 24681 Northwest Highway, Suite 400, Southfield MI, 48075, which has a registered fictitious name of  "VPA Diagnostics," "VPA Diagnostic Services," "VPA Diagnostic and Imaging Services," and "VPA Diagnostics and Imaging." VPA P.C was also registered as a foreign business corporation in Wisconsin, Illinois, Georgia, Ohio, and Pennsylvania but had its Certificate of Authority to operate as a foreign business corporation in Wisconsin, revoked by the State of Wisconsin on October 30, 2003.

21.     Defendant Seniors First Medical Center, is a Michigan corporation with a registered addressed of 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

6

22.     Defendant A Visiting Physician, is a Michigan corporation with a registered addressed of 24681 Northwest Highway, Suite 400, Southfield MI, 48075.22.

23.     Defendant Family Nurse Care, Inc. was a Michigan corporation which merged with Family Nurse Care LLC, in a tax exempt transfer based on its claim that it was a "wholly-owned subsidiary" of the "parent entity" of  FNC Acquisition LLC, an entity controlled by Defendant Mark Mitchell.

24.     Defendant Family Nurse Care, LLC, using the fictitious names "Family Home Health Care" and "Family Nurse Care," is a Michigan limited liability company also located at 27000 Hills Tech Court, Suite 200, Farmington Hills, MI 48331.

25.     Defendant Seniors First, is a Michigan corporation also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

26.     Defendant Valley Medical Services, LLC, is a Michigan limited liability company also  located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

27.     Defendant Flight 180, LLC, is a Michigan limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

28.     Defendant Mitchell Group Holdings, LLC, is a Michigan limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

29.     Defendant U.S. Medical Management Acquisition LLC, is a Michigan limited liability company also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

30.     Defendant U.S. Medical Management, Inc., is a Michigan corporation also located at 24681 Northwest Highway, Suite 400, Southfield MI, 48075.

31.     Despite using the address of 24681 Northwest Highway, Suite 400,
Southfield, MI 48075, as the official registered address for at least sixteen corporate
defendants, the suite is, and has been empty for at least one year as of August 2005,
although the lobby directory in the building advises that Suite 400 is rented to the Islamic
American University.

32.     Defendant Senior Care of America, LLC, is a Michigan limited liability
with a registered address of 27000 Hills Tech Court, Suite 200, Farmington Hills, MI
48331.

33.     Defendant Mark Mitchell represents himself to VPA, P.C. employees and
the public as an owner of VPA, P.C. He is also the registered agent in the filings with the
state of Michigan for the following defendants: Seniors First, Valley Medical Services,
LLC, Flight 180, LLC, Family Nurse Care, LLC, Mitchell Group Holdings, LLC, U.S.
Medical Management Acquisition LLC, U.S. Medical Management, Inc., and Senior
Care of America, LLC.

34.     Kurt Mitchell represents himself to VPA, P.C. employees and the public
as an owner and corporate officer of VPA, P.C.

35.     Defendant Sowilso is held out to employees and the public as the Chief
Financial Officer of VPA, P.C. He is also an officer, director, and/or holder of an
ownership interest, as well as one of the two registered agents for the following defendant
corporations and limited liability companies whose corporate headquarters are located at
the same address as VPA, P.C., 27000 Hills Tech Court, Suite 200, Farmington Hills, MI
48331: U.S. Medical Management Acquisition LLC, Mitchell Group Holdings LLC,

8

Seniors First Medical Center, VPA, P.C., A Visiting Physician, Visiting Physicians Association, VPA.

36.   Defendant Erlinda B. Del Pilar is a family practice physician licensed in the state of Michigan who is believed to have an ownership interest in and acts as the medical director of VPA, P.C.  Dr. Del Pilar acts as the Medical Director for VPA's offices in Michigan, Wisconsin, Ohio, Texas and Georgia although she is licensed only in the state of Michigan. She is also the registered agent for VPA of Ohio, P.C., an Ohio business corporation.

37.   Defendant Florello S. Itchon M.D. is licensed as a family physician and a pharmacist by the State of Michigan. He is an employee of VPA, P.C. and is a registered agent and is believed to possess an ownership interest in Defendant VPA Woundcare P.C.

## IV.   **Factual Background**

38.   Relator-Plaintiffs believe and therefore aver that defendants Mark Mitchell and Kurt Mitchell, Jeffrey Silverman, Erlinda Del Pilar and Florio Itchon are engaged in a scheme to defraud the government utilizing the named defendant corporations and limited liability companies to submit false statements as well as false claims to the government, and to circumvent the prohibition against self-referrals.

39.   Defendant VPA, P.C., which was incorporated in Michigan, currently has offices in five states: Michigan, Ohio, Georgia, Texas and Wisconsin.

40.   Defendant VPA, P.C. maintains its corporate headquarters at 27000 Hills Tech Court Suite 200, Farmington Hills, MI 48331 and lists its billing office as P.O. Box 40, Southfield MI 48075 (presumably the building located at 24681 Northwest Highway).

9

41.     VPA's Michigan Offices at which it employs physicians and technicians to make house visits to Medicare patients are located at:

a) 24681 Northwestern Highway Suite 100, Southfield MI 48075,

b) 845 Michigan Ave. Marysville MI 48040,

c) 3840 Packard Rd. Suite 170 Ann Arbor, MI 48108,

d) 1610 South Euclid Ave. Suite 3 Bay City, MI 48706,

e) 4212 Lennon Rd. Flint, MI 48507,

f) 1260 Ekhart NE Suite 112 Grand Rapids, MI 49503,

g) 5104 Loras Lane Portage, MI 49002, and

h) 2205 Jolly Road Suite A Okemos, MI 48864

42.     VPA P.C.'s office in Ohio, at which it employs physicians and technicians to make house visits to Medicare patients, are located at:

a) 2100 Sherman Ave. Suite 115 Cincinnati, OH 45212,

b) 26250 Euclid Ave. Suite 415 Euclid OH 44132,

c) 2511 Oakstone Dr. Columbus, OH 43231,

d) 3077 Kettering Boulevard Suite 319 Dayton OH 45439, and

e) 7330 Southern Boulevard Unit 6 Youngstown, OH 44512.

43.     VPA PC's offices in Texas, at which it employs physicians and technicians to make house visits to Medicare patients, are located at

a) 8711 Burnet Road Austin TX 78757,

b) 6001 Savory Suite 304 Houston, TX 77036,

c) 1400 N. Sam Houston Parkway Suite 300 Houston, TX 77032, and

10

d) 4538 Centerview Drive, Suite 149, San Antonio, TX 78228.

44.    VPA P.C.'s office in Georgia, at which it employs physicians and

technicians to make house visits to Medicare patients, is located at 1155 Hammond Dr.

NE Suite E-5230 Atlanta, Georgia, 30328.

45.    VPA P.C.'s single office in the state of Wisconsin at which it employs

physicians and technicians to make house visits to Medicare patients, is located at

2448 S. 102nd St. Suite 270 West Allis, WI 53227.

**V.    Defendants' Knowing Submission of False Claims**

### A. Improper Certification of Clients as Homebound

46.    Medicare and Medicaid pay physicians approximately $171.00 for a

comprehensive physical exam for otherwise eligible patients who are certified by a

physician as "homebound," i.e., unable to reasonably leave their homes or residential

facilities to visit a physician's office, if those patients also require intermittent skilled

nursing care or physical, speech or occupational therapy pursuant to a physician

developed home care treatment plan.

47.    Patients must initially be certified by a physician as eligible to receive

homebound care and must be recertified every 62 days.

48.    Unlike other Medicare services, there are no copays or deductibles for

physician house calls to eligible patients.

49.    VPA, P.C. holds itself out to the public and prospective employees as

"founded in 1993, Visiting Physicians Association (VPA, P.C.) was
created to provide high quality, compassionate healthcare to frail and
elderly homebound and bed bound patients. A growing number of
these patients had needs that were not being addressed effectively by
the traditional medical model. This population suffered chronic
illnesses and lacked sufficient access, information, support and

11

financial resources to receive treatment or preventative care. They also
accounted for the largest percentage of healthcare dollars spent in the
United States.

* * * *

…VPA physicians coordinate and facilitate the patient's primary care
in a way no other health system does, this insures that our practice is
clinically driven, not simply utilization driven. VPA is a complete
departure from a traditional managed care paradigm.

Over the past twelve years, VPA has evolved into the leader in
home-physician services. As the largest private practice of its kind in
the United States, VPA has set the standard in physician's homecare…
(see Exhibit "A" attached hereto)

50.     VPA P.C.'s marketing department utilizes a number of methods to

attract new senior citizens as patients, including handouts and flyers which advise:

"Help a friend! Help a neighbor!
Summer months and the hot humid weather make it difficult for some
seniors to seek medical care. Hot weather is a leading cause for heat
exhaustion, dehydration and even heat stroke. Each of these issues are major
causes of hospitalization during the summer months.
Do you have a friend or neighbor who could use a physician house call?
Don't let the nice weather fool you.
Summer heat can be dangerous! Help your friends and neighbors by telling
them about our services. Visiting physicians brings medical care to the
comfort of home!
SPREAD THE WORD!
Tell your friends and neighbors about Visiting Physicians
CARING DOCTORS MAKING HOUSE CALLS!
House calls are easy to schedule, give us a call toll free!
1-888-742-0285
You will be glad that you made the call!"

51.     None of VPA's advertisements mention that there are guidelines for

utilization of Medicare/Medicaid for house calls and VPA's marketing practices do not

explain the need to be homebound, either in their printed or radio announcements.

52.     VPA, P.C.'s office in Wisconsin prints similar advertisements on napkins

which it distributes to Meals-on-Wheels, again failing to specify that patients must be

"homebound" as defined by Medicare to qualify for coverage.

53.     VPA P.C.'s web site similarly fails to inform patients of the requirements

of Medicare and advises:

> "Visiting Physicians Association provides many services all based around
> quality physician care and treatment. Our goal is to expand the role of a
> medical practice and provide the many services and assessments that all
> focus around caring for patients in their home environment. The following
> is a partial list of VPA services: primary care visits, post-discharge visits,
> medication management visits, episodic care visits, cardiac assessments,
> diabetic assessments, respiratory assessments, nutritional assessments,
> facility pre-admit visits, disease management visits, wound care visits,
> extended care visits, care plan oversight, dementia assessments,
> osteoporosis assessment, electrocardiogram testing, x-ray studies, bone
> mineral density tests, laboratory testing, echocardiogram testing, Doppler
> studies, pulmonary function tests, injections, holter monitor testing, pulse
> oximetry tests, vaccinations, home health authorizations, medical
> equipment authorization, diagnostic testing authorization."

54.     The website also advises potential clients as follows:

> "We accept Medicare and most other insurances. House call services are
> most often covered the same as visits to traditional doctor offices. Fact #1:
> Authorizations and referrals are not necessary to initiate or continue
> treatment by VPA physicians. Fact #2: Care provided to HMO recipients
> or auto accident victims often requires a written authorization for
> treatment. The skilled staff at local VPA offices is most qualified to
> answer your specific coverage questions. With more complicated
> insurance coverages the VPA billing specialists are made available for
> coverage determination and authorization. Most people make the false
> assumption that coverage for physician house calls is limited when in fact
> it is identical to office visit coverage in almost all cases. Insurance
> coverage for house calls is subject to deductibles and co-payments the
> same way that office visits are.
>                               * * * * *
> VPA house calls will eliminate the difficulty of having to go to an office
> or clinic. VPA house calls do not require a referral from another physician.
> VPA house calls are covered by Medicare and most other insurance
> companies (HMOs require authorization)."

55.     Relators Lissette Guy and Kim Porter in the West Allis office and James

Murray in the Southfield office each estimate that approximately 40% of the patient

caseload at the Wisconsin VPA, P.C., office and the Southfield, Michigan office do <u>not</u>

13

qualify for Medicare/Medicaid reimbursement for house calls as the patients are <u>not</u>
homebound as required by Medicare. Rather, these patients enjoy the convenience
provided by house calls and are unaware of the requirements to qualify for house calls
under the Medicare program.

56.     Estimates announced by the United States' Government Accounting
Office suggest that 25% to 40% of all home health visits paid for by Medicare in the U.S.
were for services that were either never delivered or were provided to people who did not
qualify for those services.

57.     Many of the allegedly "homebound" clients serviced by VPA, P.C. still
drive or use public transportation on a regular basis and utilize VPA P.C.'s services for
its convenience. Many of VPA, P.C.'s mentally challenged patients leave their homes
daily for employment in sheltered workshops each  day.

58.     In addition to being clearly ineligible for "homebound" services, many if
not most of the 40% of incorrectly designated "homebound" patients have no medical
need to be examined by a physician every month, do not need the many tests performed
by VPA employees every month and are seen and tested solely in order to increase
Defendants' revenues.

59.     Many of the physician employees of VPA, P.C. have advised their office
managers of their belief that numbers of their assigned patients are ineligible for house
calls, only to be advised by their respective office managers to continue visiting the
patients monthly as scheduled.

60.     Defendants are aware that physicians must certify and re-certify every 62
days that patients meet two criteria for eligibility for home visits. First, they must be

homebound, which means they require the assistance of another person or must use a
supportive device or have medical contraindications to leaving home. Further, absences
from the home must be only for medical care, and any other absences must be infrequent
and brief. Persons who drive, work or regularly go out for social activities are not
considered homebound even if they require skilled nursing care. Second, the patient must
require intermittent or part time skilled nursing services or physical, speech or
occupational therapy.  Part time is less than eight hours per day. "Intermittent basis" has
been defined as less than five days per week, but can be as little as once every sixty to
ninety days so long as the care is certified by a physician as reasonable and necessary to
the diagnosis and treatment of illness or injury.  Patients must be recertified by a
physician every two months. The signing physician is verifying that the patient is
homebound, needs a qualified skilled service, is under the signing physician's care during
the period of services and the physician has reviewed and approved the plan for care.

61.     Medicare home health care has no durational time limits so long as the
patient continues to meet the coverage criteria, 42 U.S.C. Section 1395 f (a) (20) (c); 42
C.F.R. sections 409.31 *et seq.*, of being "homebound" and in need of a skilled service
(either intermittent, skilled nursing or speech, occupational or physical therapy).

62.     Defendants, aware that the Medicare regulations defining "homebound"
are drafted so as to permit an individualized assessment of every patient, *see* 42 U.S.C.
section 1395f(a), have purposefully determined to circumvent the intent and purpose of
the regulations solely for the purpose of increasing their profits, and not for any
medically reasonable grounds related to their clients' medical needs.

63.     Defendants have conspired to purposefully defraud Medicare by advertising for and obtaining patients which Defendants know are not qualified to obtain Home Health services, and coercing the physician employees into treating patients that they know do not qualify for homebound services.

64.     The new patient intake form used by Defendants, has a field which, when checked by a VPA, P.C. "intake specialist", signifies that the patient qualifies for "homebound" status under the applicable Medicare guidelines.  The VPA, P.C. employees check the appropriate field to indicate homebound status for all of their clients.  In most offices, including the Southfield, Michigan office, this field is left blank by the intake person on many patients if the intake person does not get a diagnosis over the phone.

65.     Many physicians employed by defendant VPA, P.C., as a result of lectures delivered at the required weekly meetings, know that they will lose their job if they refuse to provide treatment to a patient that they believe does not qualify for service and so they leave the homebound status portion of the form blank. Blank forms, are subsequently filled out by the VPA, P.C., employees so as to indicate that the patient is or continues to qualify for homebound status.

66.     Many of the patients serviced by defendant VPA, P.C., reside in senior independent living apartments which require that their residents be independent and ambulatory. For example, over 8 patients seen monthly by the Southfield office reside at Walton Wood, a retirement community which requires its residents to be active and ambulatory.

67.     A request for payment for homecare services provided to a patient who regularly leaves the house to grocery shop, visit friends, exercise, or ride a bicycle is a false claim prohibited by § 3729 (a)(1), which is supported by documentation that is a false record or statement under § 3729 (a)(2).

68.     Among other devices, defendant VPA, P.C., has been actively soliciting patients in independent living units despite their clear ineligibility for Medicare coverage, because of the economies with which visits can be scheduled in such large, compact residential campuses.

**B. Defendant's Scheme to Submit False Claims by Charging for Medically Unnecessary Services.**

69.     Each of the 27 offices maintained by Defendants has an office manager (not a physician) and employs "patient care coordinators."

70.     The responsibilities of the office manager include running the weekly meetings for all physicians employed by defendant VPA, P.C., so as to insure that all doctors are ordering all diagnostic tests available to be performed by VPA, P.C., or its affiliates, which tests include electrocardiograms, urinalysis, x-rays, blood tests, echo-cardiograms, holter monitor testing, pulse oximetry tests and venous/arterial blood draws, as soon as permitted and as often as permitted under the Medicare guidelines regardless of whether the tests are medically necessary, and regardless of whether the individual physician employee believes the tests are appropriate for that patient.

71.     To encourage the doctors to order more tests, an RVU summary sheet is passed out at every weekly meeting. "RVU" stands for "home visit resource-based relative value units," a billing system instituted by Medicare in 1998, which assigns monetary values to services based on the perceived time/skill involved. As part of the

17

scheme to defraud Medicare by the submission of false statements, false records and false claims for payment, each office has at least one (and up to 12 at the Southfield office) patient care coordinators whose job is to pull the patient file for each patient who is scheduled to be seen by a VPA, P.C. physician the next day.

72.     In order to insure that every physician orders every test (from the list of tests available to be done and billed by defendant VPA, P.C.) as soon as permitted under the Medicare guidelines, the patient care coordinator's job is to review each file on the day before the client's visit is scheduled and create a list of those tests which are eligible under Medicare regulations to be done and billed the next day. This list is then placed on the top of the client's file for the visit the next day.

73.     Physicians are required to order all tests on the sheet which Medicare would pay for as of that date. Only these tests provided by defendant VPA, P.C., are required to be ordered and are included on the sheet. (PAP smears, mammograms, etc, are not provided or billed by VPA, P.C. and are therefore not required to be ordered and are not included on the checklist.)

74.     Each physician employee of defendant VPA, P.C. is required to produce a minimum of 300 RVUs per week, and all physicians weekly RVU tallies are passed out, listed on a single sheet, to all physicians at every weekly meeting, where the physicians are exhorted to increase their weekly RVU totals.

75.     All aspects of the defendant VPA, P.C.'s business operations are arranged so as to charge Medicare/Medicaid for every available billing, irrespective of the medical necessity or even the medical utility of such services and thus the focus of every form,

and every weekly meeting of staff and physicians is to increase the number of RVUs billed for visits, tests, CPOs, etc.

76.    The defendants' ongoing and highly organized conspiracy to submit false claims, which includes the billing of unnecessary testing, is conclusively demonstrated by the incidence of testing reflected in their billings when contrasted with the date of VPA, P.C.'s acquisition of the people/equipment necessary to conduct and bill for certain tests/services themselves.

77.    In the months after the purchase/employment by defendants of new equipment/personnel for new types of reimbursable tests, the utilization (and billing) of the tests performed by defendants increased by the hundreds per week.

78.    For example, prior to January 2005, defendant VPA, P.C., in Wisconsin, where there is a single office, did not have a Cardiovascular Technician based in Milwaukee.

79.    In November 2004, VPA, P.C., in Wisconsin hired a Cardiovascular Technician through a temp service. The result was an immediate and substantial increase in the number of tests ordered and a corresponding increase in the RVUs.  VPA P.C., then hired the Cardiovascular Technician directly in February 2005 in order to maintain the increase in RVUs.

80.    Corresponding with the date of hire of Buzz Charton (the cardiovascular technician in the Wisconsin office) Defendants' VPA, P.C., billings from the Wisconsin office to Medicare reflect a huge increase in billings for RVU's generated by cardiovascular testing.

19

### 1.    Holter Monitors

81.    The Holter monitor is a dynamic electrocardiography device that records heart rate and heartbeats (rhythm) continuously during a 24-hour period.  The primary purpose of a Holter monitor is to record a patient's heart rate and rhythm during various activities over an extended period.  If a problem or symptom occurs, the Holter monitor allows a physician to compare the symptom with the heart rate and rhythm during that specific time.  The Holter monitor is most helpful when symptoms are frequent.  It's also helpful for showing changes in heart rate or rhythm that a patient may not notice.

82.    Defendants purchased Holter monitors in June of 2005 for the Southfield office.

83.    Prior to the purchase of the Holter monitors, such tests were rarely ordered.  When ordered, these tests were performed by independent technicians.  After the purchase, the tests were ordered with alarmingly increased frequency.

84.    The sole explanation for the change in testing patterns is the change in the ability of Defendants to charge Medicare/Medicaid for such tests.

85.    Defendant VPA, P.C., acquired Holter monitors for the Wisconsin office in August 2005.    Relators believe and therefore aver that the billings for Holter monitors in the Wisconsin office will now skyrocket.

86.    A paper authored by Cardiac Monitoring Services, LLC, of 1100 Irvine Blvd., Tustin, California is distributed to the physician employees of VPA, P.C., listing 84 ICD-9-CM diagnosis codes identified by Medicare as meeting the criteria for Holter monitoring.  The physician employees are berated weekly concerning their perceived

deficiencies in ordering Holter monitoring since, according to Defendant Mark Mitchell, there are "hundreds of reasons" to order Holter monitoring.

87.     Home EKG services (Holter monitors) are not reimbursable by Medicare/Medicaid unless they are "medically necessary". There is no coverage for such services as part of a "routine exam", § 20.15 of 'National Coverage Determinations Manual'.

88.     On August 7, 2005, defendant Mark Mitchell warned the physician-employees at the Southfield, MI, office weekly meeting that Holter tests were not being ordered with sufficient frequency and advised the physicians at the weekly meeting: "There are a hundred reasons to justify a Holter, use them."

### 2.     Echocardiograms

89.     Echocardiograms have the highest RVU rating of all the tests performed by defendant VPA, P.C., and thus, management expects every patient will receive an Echocardiogram every six months and every office manager and every patient care coordinator emphasizes to every employee physician (who is required to produce a minimum of 300 RVUs per week) the importance of timely ordering Echocardiograms every 6 months.

### 3.     EKGs

90.     Likewise, defendant VPA management requires that an EKG be performed on every patient as often as possible, based not on medical necessity but on the fact that Medicare/Medicaid will pay for the testing if the physician checks the appropriate boxes on a patient's chart.

### 4.    Blood Tests

91.    Further evidence of the scheme to submit false claims by over-utilizing unnecessary tests is the requirement that employees order nutritional panel blood tests as often as possible rather than more focused blood tests solely because the nutritional panel has the highest RVU of all blood tests.

### C.    Up-coding Home Visits

92.    Physicians' visits to homebound qualifying Medicare/Medicaid patients are divided into five types for submitting claims to Medicare/Medicaid:

> a) comprehensive
>
> b) detailed
>
> c) focused
>
> d) brief
>
> e) prolonged

93.    The highest RVU value is assigned by Medicare regulations to a comprehensive visit, which is a complete exam that should take up to one hour of a physician's time to perform.

94.    VPA physicians are informed every week by office managers (who are not physicians) that they needed to spend a minimum of seven (7) hours on the road every day, regardless of time actually spent legitimately traveling to, and examining, patients. This seven hour time requirement allows defendants to maximize the amount that they can bill Medicare/Medicaid, regardless of how that seven hours is used.

95.    GPS devices were placed in the company cars, which medical assistants use to drive the physician employees to their patient appointments.  The GPS devices

give defendant VPA the ability to prove that their doctors are out in the field for the full

seven hours.

96.     Comprehensive exams are <u>not</u> medically necessary every month and yet

defendant VPA's billings reflect that 90% of all of their physician visits each month for

years were billed as comprehensive exams.

97.     Many physicians were hesitant to bill for comprehensive exams month

after month, especially for patients who did not qualify for homebound services, but were

forced to do so by their office managers due to the RVU yield of the comprehensive

exams. In the majority of visits billed for comprehensive exams, <u>no</u> comprehensive exam

was performed by the physician or needed by the patient.

98.     On Monday August 1, 2005, after years of weekly meetings during which

management threatened and humiliated physicians who believed that comprehensive

exams could not honestly be billed for every patient for every monthly visit, defendants

abruptly attempted to cover their tracks.  In response to inquiries from Medicare,

defendants informed at least ten of the physician employees in the Southfield office that,

contrary to long-standing corporate policy, effectively immediately, only twenty-five

percent of physicians' visits should be charged to Medicare as comprehensive exams.

99.     Prior to August 1, 2005, all physicians were reminded every week that

they were required to produce the maximum amount of RVUs possible, but not less than

300 per week, and were required to perform comprehensive exams on every patient.

100.     However, as of August 1, 2005, the defendants, fearing discovery by

Medicare of the massive fraud scheme they had been carrying out since at least 1993,

defendants began to advise other groups of its physician employees in special meetings

that they were no longer required to charge approximately 90% of their visits as "comprehensive," rather, only twenty-five percent of such visits would be required to be charged as "comprehensive."

101.   None of the defendants' actions were in any way related to medical necessities or the needs of defendant VPA's clients, but rather, prior to August 1, 2005 all of the defendants' actions were solely for the purpose of obtaining the maximum amount of reimbursement possible from Medicare/Medicaid, irregardless of, and in direct contravention of the needs of their clients and of the applicable laws and regulations.

102.   Defendants' conduct on and after August 1, 2005, in instructing their physician employees to charge only twenty-five (25) percent of their visits as comprehensive visits (rather than 90% to 100% of their visits) was based not on any medically related consideration but solely on their desire to foreclose any further scrutiny of their operations which might reveal the extent and nature of the false claims submitted to the U.S. government and State governments by and on behalf of VPA, P.C., and its affiliates.

103.   The advisory of August 1, 2005, was a direct result of an inquiry concerning defendant VPA's billing practices by government officials.  However, defendants' prior intentional misconduct went unreported.

104.   Neither the prior directive that all visits be billed as comprehensive visits nor the August 1, 2005, directive that 25% of all visits be billed as comprehensive visits has any relevance whatsoever to the medical needs of defendant VPA, P.C.'s clients and the requirements of Medicare/Medicaid regulations.

24

**D.      Inflated CPO's**

105.    Defendants have recently focused their attention on exploiting the Care Plan Oversight ("CPO") provisions of the Medicare reimbursement regulations. CPO's were designed to allow a physician to be fairly compensated for the time he or she spent consulting with other health care professionals so as to insure quality care for patients.

106.    CPO forms created and copyrighted in 1999 and revised in 2001 by defendant VPA are required "to be kept in all charts for patients receiving Medicare skilled home care (nursing, Pt, Ot) or hospice care." The forms provide approximately twenty reasons approved by Medicare for CPOs and provide easy to check off total times spent in consultation. The forms require that the physician total the sheet in order to determine whether the CPO minutes are in excess of thirty (30). Medicare regulations permit monthly billing of CPO so long CPO minutes are in excess of thirty (30) per month.

107.    Defendants have also hired individuals at $10.00 per hour to go through all of the old files to pull out and bill wherever the file reflects a call that might qualify for CPO's.

108.    Defendants are utilizing the weekly office meetings to coerce the physician employees to make calls which would qualify for CPOs whenever possible despite the physician's belief as to the medical necessity of such calls, and have purchased and distributed cell phones to increase billable CPOs.

**D.      Prohibited Referrals**

109.    Section 1877 of the Social Security Act prohibits referrals by physicians to any entity in which they have any type of ownership interest or which pays them any

remuneration of any kind as a result of the referral, so as to eliminate any incentive for over-utilization of services paid for by Medicare/Medicaid.  "Referral" is defined by the Act as:

1) Except as provided in paragraph (2) of this definition, the request by a physician for, or ordering of, or the certifying or re-certifying of the need for, any designated health service for which payment may be made under Medicare Part B, including a request for consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but not including any designated health service personally performed or performed or provided by the referring physician if it is performed or provided by any other person, including but not limited to, the referring physician's employees, independent contractors, or group practice members.

2) Except as provided in paragraph (2) of this definition, a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or re-certifying of the need for such a designated health service, but not including any designated health service personally performed or provided by the referring physician.  A designated health service is not personally performed by the referring physician if it is performed or provided by any other person including, but not limited to, their

referring physician's employees, independent contractors, or group practice
members.

110.    "Referring physician" means a "physician who makes a referral as defined
in this section or who directs another person or entity to make a referral or who controls
referrals made by another person or entity."

111.    Section 411.353 provides a prohibition on "certain referrals by physicians
and limitations on billing":

a)  Prohibition on referrals.  Except as provided in this subpart, a physician who
has a direct or indirect financial relationship with an entity, or who has an
immediate family member who has a direct or indirect financial relationship with
the entity <u>may not make a referral to that entity for the furnishing of DHS for
which payment otherwise may be made under Medicare.</u>

112.    Section 411.354 defines the prohibited "financial relationship,
compensation, and ownership or investment interest" as follows:

a)  Financial relationships.  (1) Financial relationship means --

(i)      A direct or indirect ownership or investment interest (as
defined in paragraph (b) of this section) in any entity that
furnishes DHS; or

(ii)     A direct or indirect compensation arrangement (as defined
in paragraph (c) of this section) with an entity that furnishes
DHS.

(2)  A direct financial relationship exists if remuneration passes
between the referring physician (or a member of his or her

27

immediate family) and the entity furnishing DHS without any

intervening persons or entities (not including an agent of the

physician, the immediate family member, or the entity furnishing

DHS).

113.    The defendants have sought to circumvent the prohibitions on self-

referrals by hiring physicians who have no ownership interest in and receive no benefits

from ordering services and goods for which the Defendants receive Medicare/Medicaid

payments.

114.    By substituting themselves for the physicians who usually have an

ownership interest in a practice, the defendants and their related entities have attempted

to fraudulently profit from self-referrals for Designated Health Services, including tests

and services such as home health care and home nurses.  Defendant Family Nurse Care

LLC, (Family Nurse Care, and Family Home HealthCare), services which are also owned

by defendant Mark Mitchell, are utilized by defendant VPA employees who refer clients

in the Southfield, MI office to these services in clear violation of the referral prohibitions

of Medicare/Medicaid regulations.

115.    Similarly, prohibited self-referrals are made by the defendants, through

instructions to the physician-employees of VPA, P.C., to Defendant VPA Woundcare,

and all of the other named defendants.

## COUNT I
### Violation of False Claims Act
### 31 U.S.C. § 3729(a) (1) and (a) (2)

116.    Relator-Plaintiffs incorporate by reference and re-allege Paragraphs 1

through 115 as if fully set forth herein.

28

117.    This Count is brought by Relator-Plaintiffs in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for defendants' violation of 31 U.S.C. § 3729(a)(1) and (a)(2).

118.    By virtue of the above-described acts, among others, defendants knowingly and willfully submitted false claims to receive reimbursements from federal and state health care programs to which they were not lawfully entitled.  Likewise, defendants offered, paid, and received remunerations, including kickbacks and bribes, directly or indirectly, overtly and covertly, in cash and in kind, to improperly facilitate the referral of individuals, including Medicare and Medicaid patients for the furnishing of services for which payment may be made in whole or in part under a federal health care program; in violation of not only of the False Claims Act, but Title 42, United States Code, Section 1320a-7b(b)(1)(A) (soliciting and receiving remunerations); Section 1320a-7b(b)(2)(A)(offering and paying remunerations); Title 18, United States Code, Section 2; and Title 42, United States Code, Section 1395nn.

119.    Defendants' violation of the False Claims Act, the federal anti-kickback statute and the federal Stark law form the basis for the instant claims under the False Claims Act, 31 U.S.C. § 3729(a) (1) and (a) (2).

120.    Plaintiff United States, unaware of the falsity of the claims and/or statements which the defendants caused doctors and other health care providers to make to the United States, and in reliance on the accuracy thereof, paid said doctors and other health care providers for claims that would otherwise not have been allowed.

121.    The amounts of the false or fraudulent claims to the United States were material.

122.    Plaintiffs United States, being unaware of the falsity of the claims and/or statements made by defendants, and in reliance on the accuracy thereof paid and may continue to pay defendants for health care services that otherwise should not have been paid.

### COUNT II
### Violation of False Claims Act
### 31 U.S.C. § 3729(a) (3)

123.    Plaintiffs hereby incorporate by reference and re-allege paragraphs 1 through 122 as if fully set forth herein.

124.    This Count is brought by Relator-Plaintiffs in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for defendants' violation of 31 U.S.C. § 3729(a)(3).

125.    During the relevant time period in question, defendants did knowingly and intentionally conspire with each other and with others to commit offenses against the United States, as described in detail above, which are in violation of the False Claims Act, Title 42, United States Code, Section 1320a-7b(b)(1)(A)(soliciting and receiving remunerations); and Title 42, United States Code, Section 1320a-7b(b)(2)(A)(offering and paying remunerations); Title 18, United States Code, Section 2; and Title 42, United States Code, Section 1395nn.

126.    By virtue of the above-described acts, among others, defendants conspired to knowingly cause to be presented false or fraudulent claims for payment or approval, and conspired to make, use, or cause to made or used false or fraudulent records and statements, and omissions of material facts to induce the Government to approve and pay false or fraudulent claims.

127.    The amounts of the false or fraudulent claims to the United States were material.

30

128.    Plaintiff United States, being unaware of the falsity of the claims and/or statements made by defendants, and in reliance on the accuracy thereof, paid and may continue to pay defendant for improperly billed for services as set forth above.

129.    The government of the United States has made and will make payment upon false and fraudulent claims and thereby continue to suffer damages. The United States is entitled to full recovery of the amount paid by it for the substantially inflated costs pursuant to the submission of false claims that defendants caused to be submitted, plus penalty of treble damages.

## COUNT III

### Texas Medicaid Fraud Prevention Act
### Tex. Human Resources Code, Ch. 36, §36.101 *et seq.*

130.    Relator-Plaintiff incorporates by reference and re-alleges Paragraphs 1 through 129 as if fully set forth herein.

131.    This is a claim for treble damages and penalties against all defendants on behalf of the State of Texas under the Texas Medicaid Fraud Prevention Act, Tex. Human Resource Code, Ch. 36, §36.101 *et seq.*

132.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

133.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

134.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

defendants, paid and continues to pay the claims that would not be paid but for defendants' illegal inducements and/or business practices.

135.   By reason of defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

136.   The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendants.

## **PRAYER**

WHEREFORE, Relator-Plaintiffs pray for judgment against defendants as follows:

a.   That defendants be found to have violated and be enjoined from future violations of the federal False Claims Act, 31 U.S.C. §3729 *et seq.*;

b.   That this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' false or fraudulent claims, plus the maximum civil penalty for each violation of 31 U.S.C. §3729. *et seq.*;

c.   That this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

d.   That Relator-Plaintiffs be awarded the maximum amount allowed pursuant to §3730(d) of the federal False Claims Act, and the equivalent provisions of the state statute set forth above;

e.   That Relator-Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

f.   That Relator-Plaintiff recover such other relief as the Court deems just and proper or that is necessary to make Relator-Plaintiff whole.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

**SOMMERS SCHWARTZ**

PATRICIA A. STAMLER, ESQUIRE
2000 Town Center, Suite 900
Southfield, MI 48075-1100
Phone (248) 355-0300
Fax (248) 746-4001

**KENNEY LENNON & EGAN**
BRIAN P. KENNEY, ESQUIRE
ERIC L. YOUNG, ESQUIRE
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Phone (610) 940-9099
Fax (610) 940-0284

**Attorneys for Relator-Plaintiffs**

DATED:   10/3/05

# CIVIL COVER SHEET    County in which this action arose Oakland

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA and THE STATE OF TEXAS, ex rel, KIM PORTER, JAMES MURRAY and LISSETTE GAY

## DEFENDANTS
VPA, P.C., et al

**(b)** County Of Residence Of First Listed Plaintiff    Milwaukee County, Wisconsin
(EXCEPT IN U.S. PLAINTIFF CASES)

County Of Residence Of First Listed Defendant    Oakland
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

**(c)** Attorney's (Firm Name, Address And Telephone Number)
Brian P. Kenney
3031 C. Walton Rd., Ste. 202
Plymouth Meeting, PA 19462
610-940-9099

Patricia A. Stamler (P35905)
2000 Town Center, Ste. 900
Southfield, MI 48075
248-355-0300

Attorneys (If Known)

**05 - 73823**

## II. BASIS OF JURISDICTION    (Place An "X" In One Box Only)

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES    (Place An "X" In One Box For Plaintiff and One Box For Defendant)
(For Diversity Cases Only)

NANCY G. EDMUNDS
MAGISTRATE JUDGE KOMIVE

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place An "X" In One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury— Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  **Habeas Corpus**
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI ( 405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant
- [ ] 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [X] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN    (Place An "X" In One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the Us Civil Statute under which you are filing (Do Not Cite Jurisdictional Statues Unless Diversity) and brief description of cause: This action is brought pursuant to 31 U.S.C. 3729, et seq. for damages and other relief under the False Claims Act

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [X] YES   [ ] NO

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE                                     DOCKET NUMBER

DATE
10/3/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

# PURSUANT TO LOCAL RULE 83.11

1.　　　　**Is this a case that has been previously dismissed?**　　　❑ **Yes**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☒ **No**

**If yes, give the following information:**

**Court:** _____

**Case No.:** _____

**Judge:** _____


2.　　　　**Other than stated above, are there any pending or previously**
　　　　　**discontinued or dismissed companion cases in this or any**　　❑ **Yes**
　　　　　**other court, including state court? (Companion cases are**　　☒ **No**
　　　　　**matters in which it appears substantially similar evidence will**
　　　　　**be offered or the same or related parties are present and the**
　　　　　**cases arise out of the same transaction or occurrence.)**

**If yes, give the following information:**

**Court:** _____

**Case No.:** _____

**Judge:** _____

Notes: